*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1087, A16-1088**

In the Matter of the Welfare of the Child of:
M. L. M. and T. E. H., Parents

**Filed December 12, 2016
Affirmed in part, reversed in part, and remanded
Rodenberg, Judge**

Olmsted County District Court
File Nos. 55-JV-15-7446, 55-JV-14-3564

Steven K. Murakami, Murakami Law Firm, LLC, Rochester, Minnesota (for appellant mother M.L.M.)

James McGeeney, Doda McGeeney, Rochester, Minnesota (for appellant father T.E.H.)

Mark A. Ostrem, Olmsted County Attorney, Debra A. Groehler, Assistant County Attorney, Rochester, Minnesota (for respondent Olmsted County)

Vicki Duncan, Rochester, Minnesota (guardian ad litem)

Considered and decided by Rodenberg, Presiding Judge; Halbrooks, Judge; and Kirk, Judge.

## U N P U B L I S H E D   O P I N I O N

**RODENBERG**, Judge

In these consolidated appeals, appellant-mother, M.L.M., and appellant-father, T.E.H., challenge the district court's termination of their parental rights to their three-year-old son T.J.L.H. and the district court's denial of their motion for their expert-witness fees to be paid by Olmsted County. Because the record supports the district

court's findings that termination is in the child's best interest, and because clear and convincing evidence supports at least one statutory ground for termination of each parent's rights as reflected by the district court's exercise of its independent judgment in issuing its findings and conclusions, we affirm the termination of appellants' parental rights. Because the district court considered only parents' ability to pay in denying their motion that Olmsted County pay their expert-witness fees, we reverse the denial of their motion and remand that issue to the district court.

**FACTS**

Olmsted County Community Services (OCCS) became involved with this family before T.J.L.H. was born, after there were allegations of father's sexual abuse of T.J.L.H.'s stepsister, M.M.-R. (stepsister). Father was later charged with second-degree criminal sexual conduct in relation to these allegations. He was acquitted after a trial, despite his admission at his criminal trial that he grabbed stepsister's chest on two occasions. In addition to these allegations, OCCS also received several domestic violence reports from mother regarding father's abusive behavior.

T.J.L.H. was born on December 24, 2012. OCCS received reports on separate occasions that father threatened to break mother's windshield, pushed mother onto a bed and took T.J.L.H. away from her, hit and shoved mother, told mother that she should "come back and get this crying little f—ker, if he was a dog or a cat, I would kill him." He threatened to drown T.J.L.H. Father did not cooperate with investigators regarding these incidents. On another occasion, mother left T.J.L.H. alone in a bathtub with standing water while she did chores.

These and other circumstances and conditions concerning T.J.L.H.'s care resulted in mother signing a voluntary placement agreement allowing T.J.L.H. and stepsister to be placed in foster care in April of 2014. A petition was filed alleging T.J.L.H. to be a child in need of protection or services (CHIPS). In June 2014, mother admitted the allegations in the petition and signed an out-of-home placement plan. The district court approved and ordered the out-of-home placement plan, adjudicated T.J.L.H. as a child in need of protective services as to mother, and ordered T.J.L.H. into the protective care of OCCS. Father initially denied the CHIPS petition. He later waived his right to a trial, and allowed the district court to determine whether T.J.L.H. was in need of protection or services based on the verified petition and exhibits produced by OCCS. The district court found that the CHIPS petition had been proven as to father, and adjudicated T.J.L.H. to be in need of protection or services.

After T.J.L.H. was placed out of the home in April 2014, both parents continued their relationship with T.J.L.H. during scheduled parenting time. Both struggled to adequately parent. During mother's visits with T.J.L.H., she had difficulty supervising T.J.L.H. and meeting his needs. She generally did not know how to discipline T.J.L.H., could not keep him from misbehaving, failed to remember to change his diaper, and did not attempt to get T.J.L.H. to verbalize. During an unsupervised parenting time, she was found "sleeping soundly (snoring)" while her front door was open. Father consistently had problems with not greeting T.J.L.H., not engaging in play, and ending visits early. In January 2015, OCCS filed a petition for termination of parental rights (TPR 1). After a

3

court trial in April 2015, the district court denied the petition and ordered that reunification efforts with both parents recommence.

Following TPR 1, both mother and father continued to struggle with parenting. OCCS filed a second petition for termination of parental rights (TPR 2) on October 27, 2015, alleging three statutory grounds for terminating the rights of both parents: palpable unfitness, failure to correct conditions leading to placement outside the home after reasonable efforts by OCCS, and that T.J.L.H. was neglected and in foster care. *See* Minn. Stat. § 260C.301, subds. 1(b)(4), (5), (8) (2014). At trial, the district court heard testimony from both parents, the foster mother, two social workers, a support service worker, a parenting educator, the guardian ad litem, and mother's therapist. The district court also heard testimony from Barbara Carlson, who performed a parenting assessment concerning each parent, and Sarah Stelzner, an expert witness called by parents, and who critiqued the Carlson parenting assessment.

## I.    Evidence Concerning Parents' Deficiencies in Providing for T.J.L.H.'s Needs

As an infant, T.J.L.H. was diagnosed with failure to thrive. He has also been diagnosed with delayed speech and language development associated with neglect. When he was placed out of the home at 18 months old, T.J.L.H. rarely spoke audible words. At the time of trial, T.J.L.H. was three years old and his weight was in the seventh percentile for his age. The guardian ad litem testified that T.J.L.H. is developmentally delayed and "has more needs for supervision and care and consistency" than a child without such delays.

T.J.L.H.'s foster mother testified that T.J.L.H. is generally a happy, loving little boy who eats well and interacts appropriately with the foster parents' other children, that he plays with toys, explores his environment, and appears well-adjusted when he is at the foster home. However, when T.J.L.H. is with mother, he is clingy, displays self-soothing behaviors, pulls mother's hair, hits and kicks her, and has trouble eating meals. While in mother's care, T.J.L.H. is not active. The foster parent testified that T.J.L.H. "most often" hides, kicks, or screams when he is told he will be visiting with mother, and "[t]he majority of the time he does not want to go." The foster mother also testified about T.J.L.H.'s sensitivity to perceived violence, stating that on one occasion the foster parents bumped into each other and jokingly wrestled each other, which caused T.J.L.H. to become very upset. He yelled, he cried, and he told the foster father "no hurt mom."

## II.     Evidence Concerning Father's Parenting Following TPR 1

Following TPR 1, father exhibited aggressive behavior toward social workers, the guardian ad litem, and others working with T.J.L.H. First, father told the guardian ad litem that she should "go back to Iowa." Later, father was visiting with T.J.L.H., and the early childhood specialist teacher was coaching father on how to work on T.J.L.H.'s speech. She suggested that father should get T.J.L.H. to look at him. Father responded by grabbing T.J.L.H.'s chin and turning it and saying, "This is how I do it." T.J.L.H. began to cry. This alarmed the teacher. Father testified at trial that he placed his hand on the bottom of T.J.L.H.'s chin and "turned his head" and said "watch," and that T.J.L.H. only cried because parenting time was ending.

5

In June 2015, the district court held a review hearing to address allegations that father told the foster family that he was watching them, sent threatening messages to the foster mother, parked outside the foster home late at night, and made a derogatory Facebook post concerning a social worker and stepsister's victim advocate. Following this hearing, reunification efforts with father were ceased and mother was ordered to have no contact with father or his family members.[1] Despite this order, on October 31, 2015, mother's car was observed fifty feet from father's home. On December 24, 2015, mother and father were seen together at a grocery store.

A social worker testified at trial that father never contacted him to ask about T.J.L.H. or ask for any help after reunification efforts ceased. Father's next interaction with OCCS was in December 2015 when the social worker invited father to visit with his child before a pretrial parenting evaluation. Father behaved appropriately for the majority of the visit, and T.J.L.H. acknowledged father, hugged him, and used several words during the visit. However, during this visit, father twice looked over at the observing social worker as if to challenge him, first while he pulled out a pocket knife to slice an apple and again when he laid T.J.L.H. over his knee and threatened to spank him. Father later told the social worker that father would never hurt T.J.L.H., and stated that he

---

[1] The review hearing itself culminated in the district court purporting to summarily terminate father's parental rights sua sponte on the basis of a letter making the aforementioned allegations. Neither the letter nor the referenced Facebook post are contained in the record. The following week, the court held another review hearing and granted father's request to reinstate his parental rights, but ordered that reunification efforts with father cease because of his ongoing vulgar conduct.

had no concerns about the time mother left T.J.L.H. alone in a partly full bathtub as an infant.

The district court found that father is employed full-time, owns his home, and has a reliable vehicle. Father testified that he would not hurt T.J.L.H. Father's dislike of social workers was apparent. Father stated to one social worker the morning of trial that "we're all in this position because of a lying little b--ch," and that he was "f--king pissed" at the previous social worker (the target of his inflammatory Facebook post). Father testified that he believes that OCCS has access to his computer because "a black screen comes up," and he "know[s] somebody's on there." He also suggested that OCCS wiretapped his phone. These statements coincide with father's theory that foster mother, OCCS, and others have conspired to remove T.J.L.H. from his parents. The guardian ad litem testified that she had not seen or heard about father making any changes that would "correct the concerns of anger management and poor coping skills."

## III.    Evidence Concerning Mother's Parenting Following TPR 1

Following TPR 1, mother was assigned a new social worker, who provided mother increased parenting time and an additional resource in the form of meetings with a parenting educator. The parenting educator focused on helping mother ensure T.J.L.H. was eating. She suggested that mother remove toys and distractions, eat with the child, give him utensils, and take away his sippy-cup when he would not eat so he wouldn't fill up on milk. The parenting educator observed that mother was "very timid" about T.J.L.H.'s outbursts in response to her attempts to get him to eat and would give him what he wanted instead of ensuring that he ate well. Mother also exhibited frustration in

7

reaction to T.J.L.H.'s delayed speech and failed to internalize suggestions to help T.J.L.H. expand his vocabulary by pointing out objects to him and naming them. Mother often had to be coached or directed to talk to T.J.L.H. during supervised visits. Though mother did on occasion work with T.J.L.H. by reading, practicing words with him, and praising him, on other occasions she was observed lying motionless on the floor during supervised parenting time.

Mother also demonstrated an inability to supervise T.J.L.H. She regularly fell asleep during both unsupervised visits in the home and during supervised visits. The parenting educator testified that she was concerned about T.J.L.H.'s safety in the home because mother would fall asleep and the home was not child-proofed. Mother testified that she has sleep apnea but has had no doctor's appointment to address it. She also struggled to adequately supervise T.J.L.H. in the community. A social worker witnessed mother allowing T.J.L.H. to play on broken playground equipment, resulting in T.J.L.H. falling and hurting his arm on the equipment. Once at the OCCS building, T.J.L.H. ran "out of her sight . . . and she didn't know where he was." Another time, T.J.L.H. let go of mother's hand at Target and wandered off. On both of these occasions, mother failed to pursue T.J.L.H. until prompted by an observer. On another occasion, a social worker had to stop her vehicle, get out, and assist mother with getting T.J.L.H. into mother's car in the parking lot of the OCCS building. Finally, a social worker testified that, on an occasion when mother was transporting T.J.L.H., she was unexpectedly unreachable for approximately 45 minutes and gave inconsistent responses concerning her whereabouts. Following these events, mother's social worker submitted a letter to the district court

8

requesting that reunification efforts with mother cease. On September 25, 2015, the district court ordered a cessation of reunification efforts with mother because mother had made insufficient progress towards becoming able to provide full-time care for T.J.L.H.

The second petition for termination of parental rights was filed on October 27, 2015.

At trial, mother testified that she is employed full-time, has a reliable vehicle and a valid driver's license, has an apartment with adequate space for T.J.L.H., and believes she can financially provide for T.J.L.H. Mother testified that she loves T.J.L.H. and that OCCS is "really judgmental" about her parenting. She explained to the court that she has a learning disability that allows her to empathize with T.J.L.H. and that she has learned from her mistakes.

At the time of the second TPR trial, mother was attending therapy and taking self-defense classes. Mother's therapist testified that mother has been attending weekly sessions with her and working on parenting tools, self-esteem, self-worth, communication, and identifying escalating behaviors that lead to abuse. The therapist believes mother is making a sincere effort and that her parenting is "good enough." She testified that she believes T.J.L.H. should be returned to mother's care. The therapist has not observed mother with T.J.L.H.

Other witnesses testified at trial about mother's failure to internalize and follow parenting suggestions. Mother's therapist testified that mother was good at learning material presented and discussing it with other parents. However, despite the parenting educator's guidance, mother "still cuts up [T.J.L.H.'s] food into small little bite-size

9

pieces and uses her fingers and feeds him," when he should be using utensils. The parenting educator testified about mother's continuous struggle with T.J.L.H.'s delayed speech and described her efforts to encourage mother to help T.J.L.H. with his speech by talking to him while they played and by reading to him. Mother testified that some of the time when she is not coaching T.J.L.H., she is "waiting to see . . . if he's going to ask" for help with his speech. The social worker assigned to the case testified that mother's current struggles may only increase when T.J.L.H. gets older.

The guardian ad litem testified that she believes mother and father are still in contact with one another. Mother's therapist testified that mother is learning to stay away from father, but that mother has had "some contact" with father. When asked about the specific instances of contact between mother and father, mother explained that she lent her car to a friend on October 31 when it was seen near father's residence, and that she and father just happened to run into each other at the grocery store on December 24. Mother also testified that she would allow T.J.L.H. to have contact with father in the future because father is only dangerous when he gets frustrated.

Finally, social workers testified about mother's poor boundaries with T.J.L.H. A social worker testified that mother allows T.J.L.H. to put his hand up her shirt and between her thighs, and to bite, kick, and pull her hair. Mother does not intervene, causing social workers to be concerned that mother is not teaching T.J.L.H. about appropriate physical interaction.

## IV.    Parenting Capacity Assessments

Parenting capacity assessments were done before trial by Barbara Carlson. Each assessment included a clinical interview with the parent, analysis of several questionnaires, consultation of related documents and references, and an observation of one hour of parent-child play time. Carlson concluded that mother needs prompting and coaching, and is unable to supervise T.J.L.H. or meet his special needs. She also noted that mother self-reported that she has threatened and hurt others and that she experienced domestic violence at the hands of father. Carlson testified that exposure to domestic violence can have significant negative effects on children. Carlson concluded that father's Domestic Violence Inventory indicates that he has tendencies toward domestic violence. Additionally, she found that, despite father's acknowledged history of domestic violence, he refuses to work with social workers, insists OCCS should not be involved, and has not completed any domestic violence programming. Carlson recommended that both parents' parental rights be terminated.

The results of the assessments were disclosed to the parents just days before trial. Mother and father challenged the assessments and requested either that the court not consider the assessments, or that the parents be permitted to present expert testimony reviewing the assessments and opining on their validity. The district court granted the parents' request to engage the services of an expert trial witness. Mother and father requested that the district court order Olmsted County to pay their expert's witness fee. The district court made no written order, but said on the record, "I'm going to require the parties to pay those expenses."

11

At trial, parents called Sarah Stelzner as an expert witness. Stelzner concluded that the Carlson assessments were flawed because (1) the assessments referenced tests that were not actually performed; (2) Carlson did not perform the test Stelzner testified is most important; and (3) Carlson assessed both parents back to back, which may have resulted in T.J.L.H. being overly tired. Carlson also made factual mistakes in reciting mother's history in the parental capacity assessment, according to Stelzner.

Carlson observed Stelzner's testimony and testified in rebuttal. She agreed that her assessment incorrectly lists tests that she did not perform. But she stated that T.J.L.H. was not capable of performing Stelzner's preferred test and that it would not have been fair to ask father to perform the test after not having regularly seen T.J.L.H. for some time.

## V. District Court's Termination of Parental Rights

Following trial, the district court concluded that OCCS had clearly and convincingly proved (1) that both mother and father were palpably unfit to parent T.J.L.H.; (2) T.J.L.H. was neglected by his parents while in foster care; (3) that despite reasonable efforts by OCCS neither father nor mother had made progress in correcting the problems that led to out-of-home placement; and (4) that it was in T.J.L.H.'s best interests for parental rights to be terminated. Accordingly, the district court granted the petition for termination of both parents' parental rights. In doing so, the district court noted that "the vast majority of the professionals in this case" recommended termination.

The district court concluded that mother "clearly loves her son," but "[g]iven [T.J.L.H.]'s special needs, he requires an attentive, committed parent and [mother] is

unable to provide these qualities on a consistent basis" because she is unable to "stay awake, alert and attend to [T.J.L.H.'s] needs during a three hour visit" after two years of services. The district court also voiced concern that mother is having contact with father despite the court order forbidding contact, and found that her testimony denying such contact was not credible.

The district court found that father loves T.J.L.H. and has generally been appropriate with the child during visits, but has been vulgar, rude, and inappropriate to service providers. It found that father failed to produce evidence that he has made progress in therapy or participated in any domestic violence treatment. The court determined that father's hostility towards OCCS indicated a lack of control that would continue "behind closed doors when dealing with [T.J.L.H.] and [mother]," and that the "risk of such destructive parental behaviors is too great to allow [T.J.L.H.] back with his father."

The district court did not rely on the Carlson parenting assessments in terminating parental rights. It stated that, had Carlson advised against terminating parental rights, the district court would still have ordered a termination of parental rights.

Both parents moved to amend various parts of the district court's findings. The district court amended the wording of some findings related to father's interactions with stepsister, but denied the rest of the requested amendments.

Both parents appealed, and we consolidated the appeals.

**D E C I S I O N**

A court may terminate parental rights "only for grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 78, 87 (Minn. App. 2012) (quotation omitted). Termination of parental rights requires clear and convincing evidence that (1) termination is in the child's best interests, (2) the petitioner made reasonable efforts to rehabilitate the parent and reunite the parent and child, and (3) at least one statutory ground for termination exists. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). The petitioner must prove by clear and convincing evidence that one or more of the statutory grounds for termination exist. *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988).

## I.    Best Interests of the Child

We begin with review of the district court's finding that "it is in [T.J.L.H.]'s best interests that [parents'] parental rights be terminated and that he be placed up for adoption."

In a termination proceeding, the child's best interests are paramount. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 845, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 7 (2014). In determining whether termination is in the child's best interest, the court must balance: (1) the child's interest in preserving the parent-child relationship; (2) the parents' interest in preserving the parent-child relationship; and (3) any competing interest of the child. *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id*.; Minn. Stat.

14

§ 260C.301, subd. 7. If there is a conflict between the interests of a parent and a child, the interests of the child are paramount. *J.R.B.*, 805 N.W.2d at 905. The trial court's determination of whether termination of parental rights is in the best interests of the child relies on credibility determinations and therefore "is generally not susceptible to an appellate court's global review of a record." *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003).

Mother and father both argue that the district court erred in determining that termination was in T.J.L.H.'s best interests. The district court based its best-interests determination on its finding that T.J.L.H. "needs a safe and stable home—free of violence—with loving, nurturing caregivers who can consistently meet his needs," and concluded that "[s]adly, the past two years have proven that neither parent can provide such a home." The record supports the district court's findings concerning T.J.L.H's best interests.

The district court's analysis of T.J.L.H.'s best interests addresses the required considerations. First, the district court explicitly discussed T.J.L.H.'s interest in maintaining a relationship with his parents, finding that T.J.L.H. has a positive, if "controlled," relationship with each of his parents, recognizes them as his parents, and saw mother regularly until shortly before the trial. The district court also found this interest to be limited by the fact that T.J.L.H. has a more intimate relationship with the foster parents, who have provided consistent care and a nurturing "uncontrolled" environment for T.J.L.H. Second, the district court found that father and mother each have an interest in preserving the parent-child relationship. Finally, the district court

15

found that there were "competing interests" because T.J.L.H.'s developmental delays and failure to thrive diagnosis require "a safe and stable home" and "caregivers who can consistently meet his needs." The district court considered the violent history of these parents and determined that father and mother cannot provide such a home. It therefore found that termination was in T.J.L.H.'s best interests.

Mother argues that this determination was in error as to her. To support her argument, she explains how much effort she has put into trying to regain custody of T.J.L.H. However, a parent's love for her child and her desire to regain custody is not a sufficient basis for preservation of the parent's rights to her child. *J.K.T.*, 814 N.W.2d at 92. The district court's determination about T.J.L.H.'s best interests is based not on mother's failure to regain custody, but on her lack of capacity to adequately parent T.J.L.H. This determination is supported by the record. Several service providers testified that T.J.L.H. has a particular need for stability and for nurturing caregivers who can consistently care for him, and that mother does not have the capacity to meet that need. Accordingly, the record supports the district court's finding that termination of mother's parental rights is in T.J.L.H.'s best interests.

Father argues that OCCS did not present sufficient evidence to demonstrate that he could not provide a "safe and stable home—free of violence" or be a loving and nurturing caregiver. The record supports the district court's finding. There is abundant evidence in the record of father's violence toward mother and in the presence of T.J.L.H. There is evidence of father's threats to harm the child, and continuing evidence of threatening behavior even during supervised contact with T.J.L.H. At father's criminal trial, he

16

admitted that he grabbed his preteen stepdaughter's chest on multiple occasions. We conclude that the district court did not abuse its discretion when it determined that father's history of domestic violence, coupled with his unwillingness to work with OCCS, prevents father from providing a safe, stable, and violence-free home to T.J.L.H.

Additionally, neither parent effectively addresses the district court's explicit determination that T.J.L.H. has an interest in stability. This is a very important factor in determining the best interests of the child. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 134-35 (Minn. 2014) (explaining the importance of establishing stability and permanence in termination cases). T.J.L.H. has been in an out-of-home placement for two-and-a-half years, more than half of his young life. The district court found that this uncertain, impermanent arrangement is not in T.J.L.H.'s best interests. The record supports these findings. "Under our law, children are not to be kept waiting, uncertain who will raise them or where they will grow up." *Id.* at 135.

## II.     Statutory Grounds for Termination

Even when termination is in the best interests of the child, a district court must still rely on a statutory ground in order to terminate parental rights. No matter how many statutory grounds are alleged, only one statutory basis for termination must be proven concerning each parent. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 n.3 (Minn. 2005). The petitioner must show that the conditions warranting termination exist at the time of trial and will continue to exist for an indeterminate period of time. *In re Welfare of D.F.B.*, 412 N.W.2d 406, 410 (Minn. App. 1987), *review denied* (Minn. Nov. 18, 1987).

17

"To determine whether a particular statutory basis for involuntarily terminating parental rights is present," a district court first finds the underlying facts relevant to that particular basis for terminating parental rights. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899-900 (Minn. App. 2011), *review denied* (Minn. Oct. 25, 2011). Then, "in light of its findings of those underlying facts," the district court "exercises its judgment to address whether that basis for terminating parental rights is present." *Id.* Accordingly, appellate courts review terminations of parental rights on two levels. *Id.* We assess underlying facts for clear error. *Id.* at 901. We determine that a district court's finding is clearly erroneous when "it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of the Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). We then assess the conclusions drawn from those facts, including findings that a statutory criterion has been met, for abuse of discretion. *J.R.B.*, 805 N.W.2d at 900.

Here, the district court found that three statutory grounds were met for both mother and father: (1) palpable unfitness; (2) neglecting a child in foster care; and (3) failure to remedy conditions after reasonable efforts. We will address each ground in turn.

### A. Palpable Unfitness

As the starting point for its findings concerning this statutory basis for termination, the district court found that mother and father are each "presumed palpably unfit to be a party to the parent and child relationship." This finding is incorrect. On appeal, the

18

parties agree that applying a palpable-unfitness presumption was inappropriate here.[2] A presumption of palpable unfitness applies "upon a showing that the parent's parental rights to one or more other children were involuntarily terminated or that the parent's custodial rights to another child have been involuntarily transferred to a relative." Minn. Stat. 260C.301, subd. 1(b)(4). Neither father nor mother have had a prior involuntary termination of parental rights, and neither of them has had custodial rights involuntarily transferred to a relative.

Instead, the district court should have employed the opposite presumption. "Courts must presume that natural parents are fit to be entrusted with the care of their children." *J.K.T.*, 814 N.W.2d at 87. OCCS argues that this error was clerical, and that we may nevertheless affirm on the grounds of palpable unfitness. While it is possible that, applying the correct presumption, the district court might still have found the parents palpably unfit, we cannot affirm the district court's determination where it not only failed to apply a presumption of fitness, but also applied precisely the opposite presumption. The determination that the parents are palpably unfit is not supported by the district court's findings, which are, in turn, based on legal error.

## B. Neglected and in Foster Care

The district court also terminated parental rights to T.J.L.H. because he was neglected and in foster care. *See* Minn. Stat. § 260C.301, subd. 1(8). A child "[n]eglected and in foster care" is defined as a child (1) placed in foster care by court

---

[2] Noteworthy in this regard is that the county submitted proposed findings containing the presumption, which the district court adopted. The county now, and to its credit, agrees that this was in error.

order; (2) who cannot be returned to the parents due to their circumstances, condition, or conduct; and (3) "whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child." Minn. Stat. § 260C.007, subd. 24 (2014). When the district court is determining whether these elements have been met, it should consider seven factors: the length of time the child spent in foster care, the level of effort put in by the parent, whether the parent has visited the child, whether the parent had regular contact with the agency or person responsible for the child, the adequacy of the provided services, whether additional services would be likely to bring about lasting improvement, and the nature of the efforts of the agency to reunite the family. Minn. Stat. § 260C.163, subd. 9 (2014).

Even a cursory look at the factors to be considered reveals that this is not an appropriate ground on which to terminate mother's rights. The district court made no finding concerning mother's failure to make reasonable efforts to adjust her circumstances, nor did it find a willful failure on her part to meet expectations concerning visiting T.J.L.H. In fact, despite mother's "inability" to care for T.J.L.H., the district court found that mother put in a great deal of effort. This does not support a conclusion that mother willfully failed to meet expectations. There is nothing in the record indicating that mother's parenting deficiencies are willful, that she deliberately failed to visit T.J.L.H., or that she intentionally failed to fulfill her other parental duties. The

20

district court's determination that mother's parental rights may be terminated on the basis that T.J.L.H. is was neglected and in foster care is unsupported by the record.

However, we conclude that the district court's findings of fact are sufficient to support its conclusion that father neglected T.J.L.H. while he was in foster care. The district court made the appropriate findings to meet the first and second elements of the "[n]eglected and in foster care" test. Minn. Stat. § 260C.007, subd. 24. It noted that T.J.L.H. was ordered into OCCS care in June 2014 for placement in foster care. *See Id.*, subd. 24(1). The district court also explained that T.J.L.H. could not be placed with either parent due to mother's inability to parent T.J.L.H. and father's unwillingness to cooperate with OCCS and correct existing issues, including domestic violence. *See id.* subd. 24(2).

Findings related to the third element are not clearly laid out in the district court's order, but the district court premised its termination of father's parental rights on father's "unwillingness to work with service workers." The record amply supports this finding. Father has consistently displayed hostility toward social workers and the guardian ad litem. Reunification efforts were ordered to cease by the district court. Thereafter, father made no effort to reach out to the social worker to inquire about T.J.L.H. or attempt to visit him and made no showing of potential improvement aimed at resuming contact. Father stated that he believed reaching out would "get me nowhere." This attitude further evinces father's willful failure to do the things necessary to resume care of T.J.L.H.

The statutory factors weigh against father. T.J.L.H. had been in foster care for over two years at the time of trial, and, although the services provided were appropriate,

21

adequate, and reasonably expected to help reunite the family, father's efforts to comply with these services were overcome by his outspoken dislike and distrust of social workers. His demonstrated violent propensities remain unresolved. As such, additional services or continuation of the existing services would not be likely to bring about "lasting parental adjustment." *See* Minn. Stat. § 260C.163, subd. 9(6)

The record supports the district court's determination that father's failure to cooperate with social workers, attempt to visit with T.J.L.H., or in any way improve his parental deficiencies so as to enable him to resume his relationship with T.J.L.H. amounts to a willful failure to meet reasonable expectations concerning his visitation with T.J.L.H and that father neglected T.J.L.H. while he was in foster care. Accordingly, we affirm the district court's termination of father's parental rights on this basis.

## C. Failure To Correct Conditions Leading to Out-of-Home Placement

The district court also determined that OCCS's reasonable efforts failed to correct the conditions that led to T.J.L.H.'s out-of-home placement. Because we affirm the termination of father's rights on other grounds, we need not address whether the district court properly applied this statutory basis for termination of his parental rights. *T.A.A.*, 702 N.W.2d at 708 n.3.

Mother argues that the district court erred in concluding that she failed to correct the conditions leading to T.J.L.H.'s out-of-home placement. The statute allows termination on this ground upon a showing "that following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). The

22

statute applies a presumption that reasonable efforts have failed if the petitioner makes a showing on four elements: (1) the child was in an out-of-home placement for at least 12 of the previous 22 months; (2) the court approved the out-of-home placement plan; (3) conditions leading to out-of-home placement were not corrected; and (4) the social services agency made reasonable efforts to rehabilitate the parent and reunite the family.

Here again, the district court's analysis fails to coincide precisely with the statutory elements. Nevertheless, we are persuaded that the district court's findings, supported by the record, support its conclusion that reasonable efforts failed to correct the conditions leading to T.J.L.H.'s out-of-home placement, sufficient to support termination of mother's parental rights.

First, the petitioner must show that "a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months." *Id.*, subd. 1(b)(5)(i). Mother acknowledges that T.J.L.H. has resided outside of the home since April 9, 2014. Mother argues that, because the statute states that the presumption arises after only six months when the child is under eight years old "unless the parent has maintained regular contact with the child," this provision does not apply. *See id.* However, the "regular contact" language functions to narrow the scope of the six-month presumption, not to prohibit this provision's use when parents have regular contact with their child placed out of the home. The record supports the district court's conclusion that the first element is met.

Second, the court must have "approved the out-of-home placement plan." *Id.*, subd. 1(b)(5)(ii). The district court did not explicitly make a finding on this element, and

23

mother and OCCS agree that the district court did not approve an out-of-home placement specific to the time period after TPR 1. However, the record contains an out-of-home placement plan signed by mother and approved by the district court in June 2014, before TPR 1. This out-of-home placement plan stated that, in order to regain physical custody of T.J.L.H., mother would have to continue to have regular contact with children, attend all required meetings, complete a parenting evaluation and follow all recommendations, and continue to meet with the domestic violence team members. After the district court declined to terminate mother's parental rights in TPR 1, it issued an order following a review hearing specifying expectations that mother must meet going forward. The district court ordered mother to cooperate in the development of an updated case plan and safety plan, that she not have contact with father or his family members, and that she allow OCCS to monitor her compliance with the no-contact order, maintain stable employment and housing, keep OCCS apprised of any housing or employment changes, prepare and maintain a monthly budget, maintain consistent communication with the foster parents, and continue her individual therapy. The district court also ordered mother to "demonstrate her ability" to "appropriately structure activities during parenting time." Following the district court's order, OCCS and mother developed an updated out-of-home placement plan that required mother to do all of the things listed by the district court, including services appropriate to mother's parenting deficits. Although the updated case plan was not filed with the district court, the original case plan was filed with the district court and was updated as a direct result of the district court's orders after TPR 1. We conclude that, because a case plan exists, because mother was aware of the

24

expectations that had been set for her, and because the district court specifically ordered the equivalent of an updated out-of-home placement plan, this element of the statutory presumption has been met.

Third, the district court must find that conditions leading to out-of-home placement were not corrected. *Id.*, subd. 1(b)(5)(iii). The district court found that mother failed to correct the conditions, stating that even though she complied with many of the tasks in the case plan "to the best of her ability, [she] does not have the capacity to consistently meet [T.J.L.H.'s] basic and special developmental needs," and that mother has difficulty engaging T.J.L.H. verbally and adequately supervising him. The record supports this finding. The issue here is whether the conditions were corrected, and not whether the parent complied with the case plan. *J.K.T.*, 814 N.W.2d at 89. The guardian ad litem and social workers testified that mother has not internalized the parenting education and lessons, and that she requires constant coaching in order to parent. Mother continues to fall asleep while parenting, and she does not provide meaningful boundaries for T.J.L.H. Additionally, the district court determined that mother has had continuing contact with father, in direct violation of the district court's order. The record supports this finding. Accordingly, we conclude that this element of the presumption was met.

Finally, the district court must determine that "reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family." Minn. Stat. § 260C.301, subd. 1(b)(5)(iv). The district court properly determined that reasonable efforts were made by OCCS. These efforts included providing mother with resources such as social workers, domestic violence response team case management,

foster care, parenting education, and therapy services. The district court's finding that these services were appropriate, reasonable, available, and necessary to correct the conditions that led to out-of-home placement is supported by the record.

Because the district court's findings concerning each of the four elements of the statutory presumption are supported by the record and because mother's attempt to rebut this presumption relies on credibility determinations that the district court resolved against mother, we affirm the district court's termination of mother's parental rights on this ground.

## III.    Reasonable Efforts to Reunify

In addition to finding the best interests of the child support termination and finding a specific statutory basis for termination has been proven, a district court must also find that the county made reasonable efforts to aid in reunification. Minn. Stat. § 260C.301, subd. 8 (2014). A failure of the county's "reasonable efforts to finalize the permanency plan to reunify the child and the parent" will support the termination of parental rights. *Id.* Reasonable efforts are not required where a petition states a prima facie case that "the provision of . . . further services for the purpose of reunification is futile and therefore unreasonable under the circumstances." Minn. Stat. § 260.012(a)(7) (2014).

Here, and in addition to the foregoing discussion under Minn. Stat. § 260C.305, subd. 1(b)(5), the record supports the district court's determination that OCCS made reasonable efforts to reunify mother with T.J.L.H. following TPR 1. The district court noted that these efforts included:

- child protective services case management, support social workers

26

- domestic violence response team case management, domestic violence group
- safety planning
- foster care, daycare cost
- case planning conferences
- Family Group Decision-Making (FGDM) conferences
- transportation for supervised parenting time, doctor's appointments, and early childhood special education
- therapy services
- safe housing
- four months rental assistance for storage space
- family access center visitation
- parent education
- financial assistance for family members (for overnight accommodations to attend FGDM conferences)
- parenting assessment

Mother does not contest the finding that these services were provided or argue that they were inadequate.[3] We conclude that these efforts were reasonable.

Although OCCS made no efforts to reunify father with T.J.L.H. after the district court ordered a cessation of reunification efforts in June 2015, we discern no error in that cessation of efforts. Before June 2015, father had received services similar to those provided to mother. But father's evident hostility to the reunification efforts resulted in the district court's order that reunification efforts with father cease. The district court implicitly found that continuing those efforts would be futile.[4] *See Palladium Holdings, LLC v. Zuni Mortgage Loan Trust*, 775 N.W.2d 168, 177-78 (Minn. App. 2009) (noting

---

[3] Mother argues on appeal that the services *did* correct the conditions.

[4] The determination of futility is, by statute, for the district court. Minn. Stat. §§ 260C.301, subd. 8, 260.012 (a)(7). The better practice would be that such a determination be express and specific. Here, that the district court implicitly found further reunification efforts with father to be futile is evidenced by its ordering the agency to cease those efforts under circumstances where no other reason than the futility of such efforts appears from the record.

27

that this court may not assume that a district court erred by failing to address a motion), *review denied* (Minn. Jan. 27, 2010). When reasonable efforts would be futile, they are not required. Minn. Stat. §§ 260.012(a)(7), 260C.301, subd. 8. Many services were provided to both parents from the time T.J.L.H. was born until the second termination petition in October 2015. Services to father were discontinued when he evidenced hostility to the efforts, leading the district court to cease contact between father and child. Accordingly, the record supports the district court's finding that the reasonable efforts requirement has been satisfied as to both parents.

## IV.    Adoption of Proposed Findings

Both parents also argue that the district court erred by adopting large portions of OCCS's proposed findings of fact after the trial. In response, OCCS argues that the district court did not adopt the proposed findings verbatim, but "added language and made changes in certain sections."

District courts are not prohibited from adopting proposed findings. "[T]he district court's findings should reflect the court's independent assessment of the evidence," and "this is best accomplished by the district court exercising its own skill and judgment in drafting its findings." *T.A.A.*, 702 N.W.2d at 707 n.2. However, the Minnesota Supreme Court has "declined to adopt a blanket prohibition on the practice" of adopting proposed findings. *Id.* Accordingly, even if the district court had adopted the proposed findings verbatim, we would not be compelled to reverse.

The district court erred in adopting OCCS's faulty finding concerning the presumption of palpable unfitness of both parents, as discussed above. And unexplained

28

is why the district court did not correct that error in response to post-trial motions. Parents correctly point out that several of the other findings adopted by the district court are unsupported by admissible evidence.[5] As to the errors adopted by the district court, we have disregarded the erroneous findings. In several respects, as discussed above, this results in the district court's findings being insufficient to support termination, again as discussed.

Concerning the balance of the district court's findings, a comparison of them with OCCS's proposed findings reveals that the district court made numerous changes to the proposed findings. In doing so, the district court exercised its skill and judgment in issuing the findings.[6]

The district court's changes to the proposed findings concerning the Carlson parenting assessment are particularly significant. OCCS's proposed findings emphasized the import of Ms. Carlson's findings and minimized the parents' complaints about her assessment. The district court's finding 97 is significantly different than the

---

[5] Specifically, we agree with parents that findings 4(f) and 4(g) are unsupported by evidence properly admitted at trial. But those findings concern things that happened in 2014, before TPR 1. They are not critical to the district court's findings and conclusions in TPR 2.

[6] These changes included inserting a word into one sentence and adding an additional sentence to the end of finding 5, adding a clause explaining that reunification efforts with father were ceased "because of his ongoing vulgar conduct" to finding 18, adding language to finding 24 explaining why reunification efforts with mother were ceased, adding two sentences to finding 90 reasoning that father's "out of control" and "abusive" behavior "would continue behind closed doors" if he was allowed to parent T.J.L.H, and adding finding 93, which notes that, although mother loves T.J.L.H., she has sadly made only minimal progress towards being able to parent him.

corresponding proposed finding. The district court added findings 98 and 99, which state that the parenting assessment is "not critical or pivotal in the Court's decision," and that the court would have terminated parental rights even if the parenting assessment advised otherwise.

We are not persuaded that outright reversal is required because of the district court's adoption of some of OCCS's proposed findings. As to those findings that are unsupported by the record, we do not rely on them.

## V.    Witness Fees

Finally, mother and father argue that the district court erred when it refused to order OCCS to pay for Stelzner's expert witness fee, as required by Minn. Stat. § 260C.331, subd. 3 (2014). In termination of parental rights cases, "the fees and mileage of witnesses" are "a charge upon the county in which proceedings are held." *Id.* We review a district court's interpretation of a statute de novo. *In re Welfare of Child of S.J.*, 772 N.W.2d 833, 842 (Minn. App. 2009), *aff'd*, 782 N.W.2d 549 (Minn. 2010).

Parents moved the district court to disregard the Carlson assessments, which were only disclosed to parents days before the trial. Parents moved for the alternative relief of hiring Stelzner as an expert witness. The district court approved of parents engaging and presenting the trial testimony of Stelzner. The district court determined that, because mother and father were able to pay the Stelzner witness fees, Olmsted County was not required to pay. We conclude that the district court improperly applied the law. Although the statute does not reference ability to pay, the district court relied solely on the parents' ability to pay the fee in "requir[ing] the parties to pay those expenses."

30

Accordingly, we reverse the district court's denial of parents' request that Olmsted County pay Ms. Stelzner's witness fee, and we remand for the district court to order Olmsted County pay the Stelzner fees.

## C O N C L U S I O N

In sum, we find no reversible error in the district court's adoption of several portions of OCCS's proposed findings, despite this adoption resulting in the application of an improper presumption of palpable unfitness. We conclude that this legal error is fatal to the district court's palpable-unfitness determination. We nevertheless affirm the district court's termination of father's parental rights to T.J.L.H. on the basis that T.J.L.H. was neglected while in foster care. We affirm the district court's termination of mother's parental rights on the basis that OCCS's reasonable efforts towards reunification failed to correct the conditions leading to out-of-home placement. We also affirm the district court's determination that termination of parental rights is in the best interests of T.J.L.H., who deserves to have a permanent and stable home. Finally, we reverse the district court's denial of parents' motion that Olmsted county pay their expert-witness fees and direct the district court on remand to order Olmsted County to pay the Stelzner fees.

**Affirmed in part, reversed in part, and remanded.**